**CALLON PETROLEUM COMPANY,
Plaintiff-Appellee,**

v.

**BIG CHIEF DRILLING COMPANY,
Defendant-Third-Party
Plaintiff Appellant,**

v.

**William R. STANLEY, Defendant-Third-
Party Defendant Appellee.**

No. 74–4172.

United States Court of Appeals,
Fifth Circuit.

March 18, 1977.

Rehearing and Rehearing En Banc
Denied April 27, 1977.

custody. Moreover, the court stated that "we need not decide whether the Agreement is exclusive when it applies."

George P. Hewes, III, Jackson, Miss., for Big Chief Drilling Co.

Elmer H. Theis, Houston, Tex., amicus curiae, for Int'l Assoc. of Drilling Contractors.

Dale H. McKibben, Roger C. Landrum, Richard L. Forman, Jackson, Miss., for Callon Pet. Co.

James E. Sandusky, Meridian, Miss., for Wm. R. Stanley.

Before COLEMAN, GODBOLD and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

This appeal involves a controversy over the surface location of a well drilled in search of oil and gas in Clarke County, Mississippi. After the close of the evidence, the district court directed a verdict for the plaintiff and third-party defendant. We conclude this was error in part and reverse for a new trial.

■ The proper standard in federal court to test the sufficiency of the evidence for submission of a case to the jury was succinctly pronounced in *Boeing Company v. Shipman,* 411 F.2d 365, 374–375 (5th Cir. 1969) (*en banc*):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses. (footnote omitted).

Thus, we are required to view the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motions, i. e., Big Chief Drilling Company.

So viewed, the facts appear as follows: The plaintiff, Callon Petroleum Company (Callon), contracted with the defendant, Big Chief Drilling Company (Big Chief), to drill the oil well in question. The contract was a printed standard form drilling contract identified as "AAODC[1] Rotary Drilling Bid Proposal and Contract." The contract provided that the Owner (Callon) engaged the Contractor (Big Chief) "to drill the hereinafter well . . . ." The well location was dealt with in the succeeding paragraph:

"1. LOCATION OF WELL:

Well Name and Number— Menasco Mosley Unit # 1

Parish/County—Clarke          State          Mississippi

Field Name·—Prairie Branch

Well Location and[2]

Land Description — 250′ FWL and 200′ FNL of N/2 of NW/4 of Section 23–1N–14E

The responsibilities of the parties to the contract were then clearly divided. Among the "services" to be furnished by the Owner (Callon) was the following:

"6.2 Stake location, clear and grade location, and provide turnaround, including surface when necessary."

---

1. American Association of Drilling Contractors. The organization is now known as the International Association of Drilling Contractors (IADC). IADC appears in this case as an amicus on behalf of Big Chief.

2. Prior to the actual execution of the written contract, the parties had orally agreed to a well location 200′ FWL and 200′ FNL of the property. Discussion of the impossibility of drilling there had led to the movement of the site 50′ in an easterly direction before the signing of the document.

In this regard, the evidence revealed that in the normal custom and practice of the oil industry, prior to drilling of an oil well on "dry land," certain clearing, grading and boarding work had to be done in order to prepare the ground area for Big Chief's drilling equipment. This preparatory work on the surface area absolutely determines where the well will be drilled and the preparatory work was clearly the responsibility of Callon under the contract. In the instant case, a surface location was prepared by the third-party defendant, William R. Stanley, d/b/a Stanley Brothers Construction Company (Stanley), pursuant to an oral contract with Callon. Thus, Callon undertook to perform its responsibility for site preparation by contracting with Stanley to do it. Big Chief had no contractual arrangement with Stanley. The surface location ultimately prepared by Stanley was not the location designated in the contract between Callon and Big Chief. Big Chief proceeded to drill the well some nine thousand feet before Callon protested and an issue in this case is who should be responsible for the increased cost of slanting the well to conform with the original contract location.

The contract between Callon and Big Chief clearly provided that the well was to be located at the point of intersection of imaginary lines 250 feet from the West line of section 23 in Clarke County and 200 feet from the North line of the same section. This site was selected after a conversation on November 24, 1971, between Stanley and Meade Hufford, the Vice-President of Callon, in which Hufford instructed Stanley to have the surveyor "stake" this location since two originally proposed sites were un-

suitable. However, on or about December 15, 1971, Stanley and Jack Pitchford, the "toolpusher" or supervisor of the Big Chief drilling crew, met at the "staked" location and agreed that the site afforded insufficient room to prepare a site for the erection of the size drilling rig necessary for the well. While there was evidence that this location could have been used with difficulty, Stanley and Pitchford agreed that, if the location could be moved some 60 feet to the northeast, the drilling equipment could be more safely and easily erected.

■ However, at this meeting Stanley made it clear that he could not move the location from 250 × 200 without first getting approval from Callon. Stanley told Pitchford that he would undertake to get permission from Callon to move the location and then report back to Pitchford. On December 20, 1971, Pitchford called Stanley and asked him if he had received permission from Callon to move the location of the well. Stanley stated that he had gotten the "go ahead" and that it would probably take a week to ten days to prepare the site for drilling.[3]

Morris Robinson, a bulldozer operator and employee of Stanley, began grading and preparing a drilling site a few days after Christmas. He received his instructions from Billy Stanley who told him to prepare a location "where the rig could be rigged up and the well drilled." Robinson did this by mentally selecting an imaginary stake and building the location around it. This was later surveyed to be 84 feet from the North line of section 23 and 292 feet from the West line, approximately 122 feet in a general northeasterly direction from the 250 × 200 contract site.[4] This is the location

---

**3.** The conversations between Pitchford and Stanley were admitted over the objection of Callon. Clearly, as regards the third-party action between Big Chief and Stanley, the conversations were not hearsay. Fed.R.Evid. 801(d)(2)(A). Furthermore, since Stanley was hired by Callon to prepare the site, the statements by Stanley were probably not hearsay even as to Callon. See Fed.R.Evid. 801(d)(2)(D). At any rate, since Callon asserted that Big Chief undertook to move the site location for its own advantage, the conversations were admissible to explain the course of

conduct of Big Chief. See Fed.R.Evid. 801(c); *Mabry v. Travelers Insurance Co.,* 193 F.2d 497 (5th Cir. 1952); *Petroleum Carrier Corp. v. Snyder,* 161 F.2d 323 (5th Cir. 1947); see generally 6 Wigmore on Evidence § 1789 (3rd Ed. 1940); McCormick on Evidence § 249 (2nd Ed. 1972).

**4.** An earlier survey pinpointed the actual drill site at 86 feet from the North line and 295 feet from the West line. The slight difference is immaterial to the resolution of the case.

where the well was in fact drilled by Big Chief.

Big Chief began its work on or about December 30, 1971, when the conductor pipe [5] was set. It is undisputed that the building of the location and laying of the boards by Stanley precedes the setting of the conductor pipe and absolutely determines where the conductor pipe is to go. By the time Jack Pitchford returned to the well site on January 5, 1972, the location had been prepared, the conductor pipe set and the rigging-up operations begun.

Around January 6, 1972, O. C. Collins, Callon's Consulting Engineer, visited the site and Pitchford reported that the location had been moved approximately 60 feet to the northeast and that Stanley had obtained permission from Callon for this move. Collins reported this directly to Callon in a letter dated January 7, 1972. Actual drilling operations had not then commenced and did not commence until January 13, 1972. The original surveyor for Callon went back to the site on January 20 and determined that the surface location was approximately 122 feet in a general northeasterly direction from the 250 × 200 contract site. He reported this to Callon who then had another survey made of the actual well site. Finally, on January 29, 1972, Big Chief was informed by Callon of the substantial deviation from the contract location of 250 × 200.

At the time Big Chief was informed of the incorrect location of the well, the drilling operations had reached an approximate depth of 9,000 feet. Callon then took over the drilling of the well and began "slant" or directional drilling for the stated purpose of getting the well back to a position vertically beneath the original permitted location. On February 2, 1972, Callon filed a petition with the Mississippi Oil and Gas Board requesting authority to continue directional drilling. Permission was granted and directional drilling continued until the well reached an approximate depth of 10,700

feet. Big Chief then resumed control of the drilling operations and drilled to a total depth of 14,800 feet. The well was a "dry hole."

Callon then instituted this suit against Big Chief on February 6, 1973, to recover the cost of drilling the well and the added expense for directional drilling. Big Chief answered and counterclaimed against Callon for the unpaid balance allegedly due under the drilling contract. At the same time, Big Chief filed a third-party complaint against Stanley to recover any amount that might be recovered by Callon against Big Chief in the original action. Upon trial of the case the district court granted a directed verdict in favor of Callon and Stanley. This appeal followed. We conclude that the district court erred in directing a verdict for Callon.

The contract between Callon and Big Chief provided that the well was to be located at a point 250 × 200. The evidence is equally as clear that the well was not drilled at this location. The district court was of the opinion that as a consequence Big Chief was liable for having failed to abide by the written agreement. However, the contract also provided that Callon was responsible for preparing the site. The evidence shows that Callon did not prepare a drilling site at the contract location of 250 × 200.

The general rule is that a party to a contract may not take advantage of its own act or omission. *Dependents of Dawson v. Delta Western Exploration Co.*, 245 Miss. 335, 147 So.2d 485 (1962). Under the contract, we are of the opinion that the preparation of the drilling site was clearly a condition precedent to the obligation of Big Chief to drill the well. A condition precedent is a prerequisite "calling for performance of some act after the contract is entered into on performance of which the obligations depend." Williston on Contracts, § 666A (3rd Ed. 1961). Thus, the failure of Callon to perform its obligation

---

[5]. The conductor pipe stabilizes the upper portion of the well hole to prevent the softer earth from caving in.

under the contract to prepare the drill site at the contract location would normally excuse Big Chief from its obligation to drill at that site. If Callon had prepared no drill location, Big Chief could not be held liable for not drilling a well.

■ Yet, a drill site *was* prepared in this case and a well was drilled at the exact spot determined by the site location. Callon chose to perform its obligation under the contract to prepare a site by employing an independent contractor—Stanley. However, Callon may not escape its obligation under the contract by delegation to a third party. See *Bolin Oil Company v. Staples,* 496 S.W.2d 167 (Tex.Civ.App.1973). Stanley thus became the agent of Callon insofar as Callon chose to fulfill its obligation under the contract to prepare a drill site. If Stanley, in fact, acted incompetently or recklessly or even negligently in preparing the drill site at an incorrect location, then, under his contract with Callon, Stanley might be liable. Big Chief in this situation could normally not be held responsible for the manner in which Callon chose to perform its precedent obligation under the contract to prepare a drill site.

■ On the other hand Big Chief was not totally divorced from the manner in which Stanley chose to perform his contract with Callon. The evidence shows that Big Chief and Stanley met at the contract drill site and agreed that the location was unacceptable. Big Chief proposed that the location be moved some 60 feet to the northeast to better accommodate its drilling rig. If it be shown that Big Chief designedly induced Stanley to prepare a drill location different from the contract site for its own advantage and to the detriment of Callon, e. g., to thus excuse Big Chief's obligation under the contract with Callon or perhaps merely to reduce drilling costs, then Big Chief might be held liable. See *Delta Construction Company of Jackson v. City of Jackson,* 198 So.2d 592 (Miss.1967); *see also Williston supra* at §§ 677–677B. While we do not intimate that the evidence in this case amounts to actual hinderance, we do suggest that there may be circumstances under which the failure to perform a condition precedent by one party may be legally attributable to another. We are of the opinion that the question of whether Big Chief is liable to Callon for the failure of Callon to perform its obligation under the contract is an issue which should be submitted to the jury for its resolution.

Under normal circumstances it is of little or no concern to the drilling company exactly where an oil well is to be drilled. The owner is the party responsible for preparing the drill location and, once a drill site is prepared, the drill operator is entitled to assume that the owner has prepared the location where he—the owner—wants it. The owner is also responsible for obtaining permission from the regulatory body to drill at a given location. Thus, the owner is the party in a position to know the exact location of the drill site and the extent of the permission granted by the state. If the well is drilled in an "illegal" location, normally the owner is the only party to be held responsible.

In the case at bar, however, the evidence presented could take this case out of the general rule. In this case it would appear that Big Chief was in a position to know that the site prepared by Stanley was not the location proposed in the contract between Big Chief and Callon. Jack Pitchford had visited the site with Stanley and concurred in the determination that the location should be moved. In addition, a reasonable inference from the evidence would also support the proposition that Pitchford knew that the well was to be an "exception location." Finally, an "eyeball" survey of the actual location that was prepared by Stanley could arguably have revealed to Pitchford that the well was about to be drilled in a location removed from the contract site. A drilling operator in the position of Big Chief could not thus negligently disregard what it knew or reasonably should know and drill a well contrary to the express terms of its drilling contract. While a drilling operator is certainly not required to conduct a precise survey to insure that the owner has prepared the site at

the correct contract location, he may not ignore the significance of what he actually knows or reasonably should know to the detriment of the owner. If under the facts of this case it were found that Big Chief failed in its obligation reasonably to apprise Callon of the incorrect location, then Big Chief could be held liable for the increased expense of the directional drilling. Of course, if this be shown, the normal rules relating to the requirement that one mitigate his damages would be applicable.

In sum, there appears to be two theories under which Big Chief may be held liable to Callon for drilling the well in this case in the incorrect location. Big Chief would be liable if upon submission of the evidence to a jury, the jury concluded that Big Chief wrongfully induced Stanley not to perform the obligation of Callon under its contract; to wit, prepare the location at 250 × 200. Second, Big Chief would be liable if the jury found that Big Chief acted negligently in going ahead with the drilling of the well at the prepared site without apprising Callon of the information of which it was actually aware. In this regard the interpretation of the information relayed to O. C. Collins, Callon's Consulting Engineer, by Big Chief on January 6, 1972, becomes extremely important. Big Chief asserts that the information was sufficient notice to Callon that the well had been moved. Callon contends that it was insufficient in that it was reasonably interpreted by Callon to relate to the original move from 200 × 200 to 250 × 200. The sufficiency of the notice in fulfilling Big Chief's obligation to apprise Callon of facts within its knowledge is the traditional province of the jury.

■ Finally, with respect to all of the issues that we have discussed, it is not unimportant to observe that, even though the facts may appear clear from the evidence, a directed verdict is not proper when, from the facts thus disclosed, conflicting inferences might be drawn. It should be left to the finder of fact—the jury in this case—to resolve such conflicting inferences. *See. Tennant v. Peoria & Pekin Union Railway Co.,* 321 U.S. 29, 35, 64 S.Ct. 409, 88

L.Ed. 520 (1944); *Cleveland Trust Co. v. United States,* 421 F.2d 475, 479 (6th Cir.), *cert. denied,* 400 U.S. 819, 91 S.Ct. 35, 27 L.Ed.2d 46 (1970).

■ The district court also dismissed Big Chief's complaint against Stanley based upon implied indemnity. We conclude that this was correct. There are two basic theories under which Big Chief might be held liable to Callon. Under each theory Big Chief would be held responsible either because of its active misconduct or its failure to act when the circumstances dictated. The law in Mississippi was set out in *Home Insurance Co. v. Atlas Tank Mfg. Co.,* 230 So.2d 549, 551 (Miss.1970):

Two critical prerequisites are generally necessary for the invocation of noncontractual implied indemnity in Mississippi: (1) The damages which the claimant seeks to shift are imposed upon him as a result of some legal obligation to the injured person; and (2) it must appear that the claimant did not actively or affirmatively participate in the wrong.

*See also Alabama Great Southern Railroad Co. v. Allied Chemical Corp.,* 501 F.2d 94, 98–103 (5th Cir. 1974), *aff'd en banc,* 509 F.2d 539 (1975). In the context of this case, the liability of Big Chief, if liable at all, would be the result of active wrong on its part. Thus, under Mississippi law, implied indemnity will not lie.

The order of the district court dismissing the third-party complaint is AFFIRMED. The order of the district court sustaining the plaintiff's motion for a directed verdict is REVERSED and the case REMANDED for further proceedings.

COLEMAN, Circuit Judge, concurring in part and dissenting in part:

The chief adversaries in this oil well drilling breach of contract controversy are Callon Petroleum Company (Callon), which contracted to have the well drilled, and Big Chief Drilling Company (Big Chief), which agreed to drill it. The respective parties were *bound by a written contract* but for a time Callon exercised little or no diligence to see that it was receiving what it had

contracted for. Through its drilling chief, Big Chief knew very well that it was not drilling where it had contracted to drill.

Callon found an undrilled tract in the North ½ of the Northwest ¼, Section 23, Township 1 North, Range 14 East, Prairie Branch Oil Field, Clarke County, Mississippi. It proceeded to acquire the necessary leases to drill in search of oil and gas. Don Caldwell, the company geologist, advised Callon that if it expected to strike oil bearing sand, thought to be at 14,800 feet, it should obtain an exception order from the Mississippi Oil and Gas Board permitting it to move the drilling site of the proposed well nearer the unit lines than allowed by standard regulations. The recommendation was that the well be drilled 200 feet from inside the north and west lease lines. The exception was secured.

Agreeably to the exception order, on November 23, 1971, Meade Hufford, the executive vice-president of Callon, employed Engineering Services of Jackson, Mississippi, to survey and stake the proposed well location at 200 feet from the north line and 200 feet from the west line of the drilling unit. Hufford instructed the survey party chief of Engineering Services to call him if the location was "bad", that is, hampered by obstacles.

On November 24, 1971, Engineering's party chief met at the 200 × 200 stake with David Stanley, a representative of Stanley Brothers, who had been hired as an independent contractor by Callon to do the clearing and preparation of the drill site. They discussed the various problems found there. The stake was 105 feet from an occupied dwelling, 50 feet from an electric power line, and a paved public road ran nearby, posing serious problems, if not insurmountable difficulties, in the erection of the drilling equipment. They decided to call Mr. Hufford. The party chief placed the call and spoke briefly with Hufford, but he then turned the phone over to Stanley. Stanley advised Hufford of the problems and was instructed to place the stake 200 feet from the north line and 250 feet from the west line, which would cause a 50 foot

shift to the east. Stanley then relayed this information to the party chief, who set the stake at the 200 × 250 foot point.

Callon then petitioned the Oil and Gas Board for a further exception order to permit moving the stake to the new location, which was approved by the Board on December 15, 1971.

At this point no contract had been made with the well driller and everything had proceeded "according to Hoyle".

On or around December 15 Billy Stanley of Stanley Brothers met Jack Pitchford, Big Chief's toolpusher in charge of drilling operations, at the 200 × 250 drill stake. They decided that even this location would not afford enough room to erect the drilling rig. They decided that if the stake were moved northeast 60 feet the problem would be solved.

Pitchford did not talk to Callon or any of its representatives about this new development. Pitchford testified that Stanley told him he would have to check with Hufford before a change of location could be authorized, that he would try to clear the change of location with Hufford, and would be back in touch with him. Pitchford had to leave for Oklahoma. Before leaving, he called Stanley, not Callon, on December 20, 1971, to see if the problem had been resolved. Over objection by Callon, Pitchford was allowed to testify that Stanley told him that "he had the go ahead on the well". This was never confirmed by testimony from either Callon or Stanley, so it was rank hearsay insofar as it applied to Callon.

Neither side called Bill Stanley as a witness. His pretrial deposition, noted as being at page 865 of the record, is not there, presumably because it was not offered in evidence at the trial. I do not know why both sides so scrupulously stood so far back from Mr. Stanley. What he knew, if given subject to cross examination, should have cleared up a big blind spot in this record. Instead, what he knew, if anything, came in as hearsay.

In any event, Pitchford testified that he interpreted Stanley's statement to mean

that a change of location had been accepted by Hufford, but he did not contact Callon to verify either the statement or the interpretation. Pitchford did not return to the site until around the first of January, where he found the completed site preparation. The litigants stipulated that Stanley (not Callon) had instructed Morris Robinson, his dirt contractor, to level the site "where the rig could be rigged up".

After negotiations, Big Chief submitted a drilling bid proposal and contract, which Callon executed on December 27, 1971, and Big Chief signed on January 3, 1972, effective December 27. This was about two weeks after Big Chief's man Pitchford had agreed with Stanley (but not with Callon) that the actual drilling stake would have to be moved 60 feet from the point designated in the contract.

The written contract specified that Big Chief was to drill the well vertically from a point 200 feet south of the north line and 250 feet east of the west line of the 80 acre unit, a specific location. Before the contract was ever executed, Big Chief's man in charge of the drilling knew that the well was not going to be drilled there. Big Chief's excuse for not drilling where it had contracted to drill was reliance on what Stanley had said and what Pitchford thought that meant, although Stanley specifically told Pitchford that he could not authorize a change without Hufford's permission.

To meet a time limitation in the lease, the well had to be started before December 31. The start was begun before that day, *before the contract document was signed,* but actual drilling did not get under way until January 13.

In the meantime, January 7, Collins, a petroleum engineer employed by Callon to see that the well was drilled within directional tolerances, visited Pitchford at the drill site. On that date, Pitchford told Collins that Stanley had told him that he had received permission to "walk" the drill stake approximately 60 feet to the northeast of the contracted drilling point. As a matter of fact, the drilling rig had been

erected at a point *not* 60 feet, *but* 122 feet, from the true stake. No witness saw the stake moved for an additional 62 feet, but the testimony was clear that Stanley had prepared the drill site at that point. In any event, the well went down from a point 295 feet east of the west line and 86 feet south of the north line of the drilling unit.

Collins wrote a letter to Callon, informing it of the 60 foot move which had been reported to him. Callon received this letter January 10, 1972, three days prior to the commencement of actual drilling. No action was taken. Both Caldwell and Hufford (of Callon) testified that they were not alarmed by this information since both "assumed" that this statement indicated the location had been moved "60 feet to the northeast" in compliance with the original change from 200 × 200 to 200 × 250 feet. They tried to justify this assumption, erroneous as it was, by testifying further that it was "unheard of" to move an exception location. Hufford never visited the drill site at any time. When Caldwell finally got there, well after the horse was "long gone", a witness said that he was an "angry, angry man".

Nevertheless, on January 13, the very day that real drilling began, Callon requested Engineering Services "the next time they were down that way" to look at the location. While this inspection was being made, Big Chief kept right on drilling. On January 20, Engineering Services determined the well location to be 86 feet from the north line and 295 feet from the west unit line. The well was then a mile into the earth.

A verification surface survey was then undertaken for Callon by a Laurel firm. Big Chief kept on drilling. On January 29, when the well was down to 9,271 feet, the Laurel firm confirmed the prior survey. The bottom of the hole was then 106 feet from the north line and 230 feet from the west line.

On February 2, Callon filed a petition with the Oil and Gas Board, advising it of the foul-up and that it had undertaken directional drilling designed to put the bot-

tom hole where it should have been, had perpendicular drilling been prosecuted from the right location, 200 × 250. It requested permission to continue. Permission was granted. Directional drilling was done between 9,271 and 10,769. At depth 10,769, the bottom of the hole was 207 feet south of the north line and 284 feet east of the west line. This lacked 7 feet one way and 34 feet another from being directly below the point from which Big Chief had contracted to drill. Big Chief then resumed control of the drilling and completed the well to contract depth.

The upshot of this (mis)managerial imbroglio was that Callon sued Big Chief for having performed "with total disregard for its contract obligations", etc., demanding damages in the sum of $76,920.77, alleged to have been the additional cost of the directional drilling.

There was no doubt that Big Chief had contracted to drill the well at 200 × 250. There was no doubt that it had not drilled there. Consequently, it fell back to these affirmative defenses:

1. The practice in the oil and gas industry does not place upon the drilling contractor the burden of having the location surveyed. A necessary condition precedent to the obligation and performance under the contract was the preparation of the drill site by the plaintiff. Under the practice uniformly followed in the oil and gas industry the operator (in this case the plaintiff), prepares the drill site, and the drilling contractor relies on the site so prepared as the correct site for the drilling of the well.

(The answer to this defense is that Big Chief knew before it signed the contract that the cleared site was not the contract site.)

2. The well in question was drilled on the site selected and prepared by the plaintiff at the plaintiff's sole cost, risk and expense, and as a necessary condition precedent to defendant's obligation on the contract. Even if the drill site prepared by plaintiff, acting through its employees, agents and contractors, was not the surface location called for in the written contract

between the parties, such site was prepared at a location authorized by the plaintiff, and plaintiff is now estopped to contend to the contrary.

(The answer to this is that except for hearsay there is no evidence that Callon authorized the change.)

3. Even if plaintiff did not authorize its employees, agents and contractors to prepare the site at the location where, in fact, it was prepared, defendant reasonably relied on the verbal representations and acts of plaintiff's employees, agents and contractors that the site so prepared was the location authorized by plaintiff.

(The answer to this is that Big Chief signed the contract after its contacts with Stanley, and not before.)

Big Chief also counterclaimed for $21,-651.21, allegedly due and unpaid on the contract.

Callon responded to Big Chief's affirmative defenses with the assertion that Big Chief and other parties had knowingly and intentionally moved the surface location of the well for their own convenience and economic gain without Callon's knowledge and consent, a direct and intentional breach of contract, knowingly done.

The case was tried to a jury, in a contest which lasted seven days, at the conclusion of which the District Court directed a verdict for Callon. Judgment went to Callon in the sum of $36,500.

Big Chief challenges the directed verdict with eleven assignments of error. Their validity or invalidity must be measured by the standards enunciated in *Boeing v. Shipman*, 5 Cir. 1969, 411 F.2d 365. They may accurately be described as linked, in groups, to Big Chief's affirmative defenses, raising, says Big Chief, questions of fact about which reasonable men might well differ, thus requiring submission to the jury.

I begin my analysis of this badly mishandled situation by recognizing that Callon had undoubtedly agreed to clear and prepare the drilling site at the location designated in the contract. Vis a vis Big Chief, Callon could not absolve itself of that duty

by unilaterally delegating it to an independent contractor.

It is nevertheless the law in Mississippi that a party to a contract is estopped to take advantage of his own act or omission to escape liability on it, *Dawson's Dependents v. Delta Western Exploration Co.,* 147 So.2d 485, 487 (Miss., 1963).

It stands undisputed that before the contract was signed, Big Chief's driller knew that the stake had been "walked" sixty feet from the right place and no effort was made to verify Callon's acquiescence. The total "walk" of 123 feet could not have changed the fact that Big Chief *knew that it was not drilling at the place approved by the Oil and Gas Board and particularly described in the contract.* Big Chief elected to drill, regardless of the failure to prepare the site at the point designated in the contract, signed after all the contacts with Stanley, and with never a whisper to Callon about a variation.

There is no evidentiary support for the contention that Callon authorized a change in the location of the drill stake. Hufford testified that Stanley had never talked to him about it, that he had never authorized it, and that the first he knew of any discrepancy was when he saw Collins' letter. Hufford's testimony stands unrefuted by any competent testimony. Big Chief did not call Stanley as a witness. The hearsay testimony of Pitchford as to what Stanley said that Hufford said, and that of Robinson as to what Stanley said that Hufford said, was obviously incompetent.

There is no merit to the argument that Big Chief could reasonably rely on Stanley's *representations with reference to moving the drill stake.* Before the contract was signed, Big Chief's agent knew that the stake had been moved to a point other than that prescribed in the contract. When Pitchford returned to the scene about the first of January, he knew that the stake was not at the point prescribed in the contract. A telephone call to Callon could have ascertained the reliability of Stanley's representations. Out of court admissions, statements, and declarations are not admis-

sible to prove either agency or its scope or intent, *Austin v. Gulf States Finance Company,* 308 So.2d 90 (Miss., 1975).

On either waiver or estoppel, on facts about which men could not reasonably differ, the law will not now allow Big Chief to defend its breach on the ground that Callon had failed to prepare the site at the location prescribed in the contract.

Amicus curiae, International Association of Drilling Contractors, urges that this result will hereafter require a driller to verify the correctness of the drilling site before proceeding to drill. I disagree. This is a case in which the driller, unknown to the owner, participated in moving the drill stake from the known location to one which would better suit his own convenience and then signed a contract for the correct location. That is what should control the outcome of this appeal.

Big Chief also argues that, by reasonable diligence, after receiving Collins' letter of January 7, 1972, Callon could have avoided the consequences of which it now complains; that by its conduct after receiving that letter it waived its right to complain, that Callon undertook a program of directional drilling on its own initiative and for its own reasons and is thus responsible for all the expenses incurred in connection therewith. Big Chief did not include these issues in the affirmative defenses filed in response to the complaint. In the main, they go to the issue of damages.

I think the correct response to this is that the well had reached a depth of 5,000 feet when Callon first received notice, that Big Chief kept on drilling while the suspected discrepancy in the drilling site was being checked out, and there is no evidence in the record to indicate that any less directional drilling would have been required at the 5,000 foot depth than at the 10,000 foot depth. Certainly, there can be no dispute that under the Mississippi Oil and Gas statutes there could have been serious legal consequences for failure to drill at the site approved by the Board.

On the issue of damages the parties stipulated:

*Stipulation*

Counsel for plaintiff and counsel for defendant stipulate that upon the Court having directed a verdict for plaintiff against defendant that the amount to be entered in the judgment in favor of the plaintiff against defendant shall be $36,500.00 and that said amount shall be considered the same as though having been entered by a jury and shall be appealable by either party. This stipulation shall in no manner be deemed an admission of liability on the part of the defendant nor an admission as to the true measure of damages by either party but is made to expedite the disposition of the trial of this case in lieu of a jury verdict, subject to the right of appeal by either party.

I would, in all respects, affirm the District Court.