907 F.2d 536
 CITY NATIONAL BANK and Texas Bank, Plaintiffs-Appellants,
Cross-Appellees,
v.
UNITED STATES of America, and Federal Deposit Insurance
Corp., In Its Corporate Capacity,
Defendants-Appellees, Cross-Appellants.
 No. 89-1359.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 2, 1990.
 
 Robert E. Wood, Williford, Collmar & Wood, Dallas, Tex., for plaintiffs-appellants, cross-appellees.
 Jerome Madden, U.S. Dept. of Justice, Washington, D.C., William Royal Furgeson, Jr., Raymond E. White, Kemp, Smith, Duncan & Hammond, El Paso, Tex., Sam E. Taylor, Jr., Federal Deposit Ins. Corp., Midland, Tex., for U.S.
 Sharon Sivertsen, Federal Deposit Ins. Corp., Washington, D.C., for Federal Deposit Ins. Corp.
 Appeals From the United States District Court Western District of Texas.
 Before GOLDBERG, REAVLEY, HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 City National Bank and Texas Bank filed this suit against the Federal Deposit Insurance Corporation complaining of the FDIC's management as the lead on a loan in which they owned participating interests. The banks originally purchased their interests in the loan from First National Bank of Midland in Midland, Texas. The FDIC acquired the loan through a purchase and assumption transaction after the failure of FNB-Midland.[1] An amended complaint asked for a declaratory judgment and an accounting. It included claims against the FDIC for breach of contract, breach of fiduciary duty, and breach of the duty of good faith. The banks filed a separate suit against the United States under the Federal Tort Claims Act asserting a gross negligence claim in addition to the above claims. The district court consolidated the cases.
 
 
 2
 The declaratory judgment and accounting claims were dropped, and the case was tried to a jury. The jury found that the FDIC breached the participation agreements and that the FDIC was grossly negligent in its dealings with the banks. However, the jury rejected claims that the FDIC was guilty of fraud or failed to act in good faith. The district court did not submit the fiduciary duty claims to the jury. The jury found that the FDIC's breach of participation agreements and gross negligence was the proximate cause of damages to each of the banks in the amount of $239,786.00. Sensitive to the statutory contours of the federal government's waiver of sovereign immunity, the banks asserted their contract claim only against the FDIC, pointing to its "sue and be sued" clause, 12 U.S.C. Sec. 1819, and asserted their tort claim only against the United States, pursuant to the FTCA, 28 U.S.C. Sec. 1346(b). See Gregory v. Mitchell, 634 F.2d 199, 204 (5th Cir.1981).
 
 
 3
 The district court granted the motions for judgment notwithstanding the verdict filed by the FDIC and the United States. The court concluded that the jury's breach of contract and gross negligence findings were not supported by the evidence and that the gross negligence claim against the United States fell within the discretionary function exception to the FTCA. This appeal followed. We are persuaded that the evidence supports the jury's finding that the FDIC breached its contract with the banks and reverse the district court's judgment n.o.v. on this claim and remand the damages portion of the claim. We also conclude that the banks' claim against the United States sounds solely in contract and falls outside the FTCA's waiver of sovereign immunity.
 
 
 4
 * During the late 1970's and early 1980's Permian Distributing, Inc., Fred D. George, Inc., their two principals, Larry Stewart and Fred George, and other related companies executed approximately twenty promissory notes in favor of FNB-Midland. The agreements regarding security included cross-collateralization clauses so that, generally, all of the property of the PDI-related companies and their principals secondarily secured all of the notes. The note at issue in this case was executed in July 1983 by FDGI and PDI in the original principal amount of approximately $1.9 million in favor of FNB-Midland. This note was an extension of a loan previously made to FDGI to purchase the "Y" Canyon Ranch in Catron County, New Mexico, and was secured by a deed of trust on the ranch. The "Y" Ranch Note was guaranteed by George, the president of FDGI, and Stewart, the president of PDI. City National Bank and Texas Bank each purchased a 26.25% participating interest in the "Y" Ranch Note from FNB-Midland for $500,000. FNB-Midland owned the remaining 47.5% of the "Y" Ranch Note.
 
 
 5
 Six of the FNB-Midland notes were executed by PDI in connection with its purchase and operation of a west Texas Coors beer distributorship between October 1979 and May 1983. The first and primary note was for $3,500,000. It funded PDI's purchase of the beer distributorship and was secured by a deed of trust on real property, PDI equipment and inventory, and 48% of PDI stock. Stewart owned the 48% interest in PDI pledged to secure the note. He also guaranteed the note. The other notes funded the operation of the distributorship. A $225,000 note funded a PDI line of credit; two unsecured notes totalling $150,000 allowed PDI to purchase the assets of another distributorship; and two notes totalling $670,000 funded PDI's purchase of inventory. The last two notes were secured by PDI inventory, equipment, and vehicles and Stewart's 48% interest in PDI and were guaranteed by Stewart and George. The face amounts of the six notes totaled $4,545,000.
 
 
 6
 Some of the other notes executed in favor of FNB-Midland were: a $1,064,333 note to purchase cattle for the "Y" Ranch, an approximately $500,000 note to purchase oil well service equipment, and an approximately $100,000 note to purchase antiques. Each of these notes was primarily secured by the property purchased with the loan proceeds.
 
 
 7
 In October 1983, approximately three months after the plaintiff banks purchased interests in the "Y" Ranch Note, FNB-Midland failed and the FDIC acquired these notes and collateral. On April 30, 1984, the FDIC extended all the notes in the debtors' credit line in order to assist the debtors in their effort to obtain third-party financing for the entire line of credit. After the extension agreements expired, the FDIC continued to negotiate with the debtors in an attempt to settle the entire credit line. In December 1984 the FDIC entered into nineteen extension and renewal agreements with the debtors. The FDIC extended notes secured by real estate by a year and notes not secured by real estate by two years. The debtors paid the FDIC $150,000 as consideration for the renewals and extensions and agreed to pay monthly installments of $75,000. The banks received a share of the payments made by the debtors pursuant to the nineteen agreements equal to the percentage the "Y" Ranch Note represented in the overall credit line.
 
 
 8
 The December 1984 renewal and extension agreements, including the "Y" Ranch Note agreement, also stated that the debtors agreed to grant the FDIC additional collateral in the form of a second lien on certain named real estate, a security interest in 100% of the common stock of a certain company, and a "[s]ecurity interest in an additional forty-six percent (46%) of the issued and outstanding common stock of [PDI], resulting in a security interest in a total of ninety-four percent (94%) of the issued and outstanding stock of [PDI]." George owned the 46% interest in PDI. The FDIC never perfected these security interests. Although the first two items of additional collateral were worthless since they already secured primary loans that far exceeded their value, George's 46% interest in PDI was unencumbered. In January 1985 the FDIC informed the plaintiff banks that "[a]dditional collateral totaling over one million and cash of $150,000 was secured to extend the real estate notes for one year."
 
 
 9
 The FDIC stated shortly after acquiring the "Y" Ranch Note that it was their intention to sell the "Y" Ranch as quickly as possible. An FDIC memorandum emphasized that the one year renewal of the "Y" Ranch Note and other real estate notes in December 1984 was designed to give the debtors one more year, until November 30, 1985, to market the property. C.E. Boyd, a managing officer for the FDIC, testified at trial that it is a very common FDIC practice to allow cooperative debtors of property to market the property for a time rather than the FDIC because the FDIC's direct involvement gives the appearance of a fire sale and causes the price to drop dramatically. The FDIC told the banks it would begin marketing the "Y" Ranch itself at the end of November 1985. The FDIC, however, did not take steps to market the property itself until March 1987, over fifteen months after the November 30, 1985, self-imposed deadline. The ranch sold about eight weeks after the FDIC took over the marketing.
 
 
 10
 In late 1986 the FDIC settled with the debtors. The key to the settlement was the sale of PDI and its Coors distributorship to Alan Kahn. Kahn, through his company, Sun Country Industries, Inc., purchased 94% of the PDI stock for $3,244,877. Kahn required the release of Stewart and PDI on all notes as a condition to his purchase of PDI. Kahn wanted Stewart free from his indebtedness so he could concentrate on running the Coors distributorship.
 
 
 11
 The FDIC also renewed two notes from George totaling approximately $1.8 million and released George from liability on all other notes. As consideration for the renewal of the two notes and the releases, George contributed his 46% interest in PDI to the settlement. Because PDI's primary asset, the Coors distributorship, could not be sold separately from PDI, the FDIC needed George to voluntarily contribute his 46% interest in PDI to sell the distributorship to Kahn. Over a year later the FDIC compromised the renewed notes for $1,000,000.
 
 
 12
 As part of the settlement the debtors deeded the "Y" Ranch to the FDIC in lieu of foreclosure. The FDIC then sold the "Y" Ranch to a third-party for $895,000. Each bank received $223,688, its 26.25% interest in the net proceeds from the sale of the ranch. Under the 1984 "Y" Ranch Note renewal and extension agreement the banks were entitled to a security interest in 46% of outstanding PDI stock. The FDIC, however, did not distribute any of the funds paid for this stock to the banks. The FDIC applied the approximately $3.2 million in proceeds to the notes which had first liens on Stewart's 48% interest in PDI and the PDI assets. The amounts owed on these notes exceeded $3.2 million.
 
 
 13
 The FDIC sold the remainder of the debtors' encumbered property and applied the proceeds to the notes with first liens on the particular property. There was no excess available to satisfy the banks' second liens under the cross-collateralization clauses. At the time of the settlement all of the debtors were insolvent.II
 
 
 14
 We turn first to whether the district court properly granted the FDIC's motion for judgment notwithstanding the verdict on the banks' breach of contract claim. We determine whether, viewing the evidence in the light most favorable to the jury's verdict and making all reasonable inferences in favor of the verdict, there is substantial evidence to support it. Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc). If conflicting inferences can be drawn from the evidence, it is error for the district court to grant a judgment n.o.v. Callon Petroleum Co. v. Big Chief Drilling Co., 548 F.2d 1174, 1180 (5th Cir.1977). We will affirm the judgment n.o.v. only if a reasonable person could not have arrived at the jury's verdict. South Hampton Co. v. Stinnes Corp., 733 F.2d 1108, 1116 (5th Cir.1984).
 
 
 15
 The participation agreement limits the lead bank's liability for mistakes in performance to acts of gross negligence. It provides that the FDIC is only liable for "losses or expenses ... due to ... gross negligence." The parties agree that the district court properly defined gross negligence by reference to Texas tort law. In Texas gross negligence is defined as "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare" of the plaintiff. Burk Royalty Co. v. Walls, 616 S.W.2d 911, 920 (Tex.1981) (citation omitted). Gross negligence is distinguished from ordinary negligence by "the mental attitude of the defendant," not by the nature of the negligent act. Id. at 922. "The plaintiff must show that the defendant was consciously, that is, knowingly, indifferent to his rights, welfare, and safety. In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care." Id. at 922.
 
 
 16
 On appeal the banks assert that substantial evidence supports the jury's finding that they were injured by the FDIC's gross negligence in performing its duties under the participation agreements on either of two factual theories. They argue that there was substantial evidence that (1) the FDIC was grossly negligent in letting the debtors market the "Y" Ranch rather than stepping in and marketing the property itself, resulting in the banks receiving far less from the sale of the ranch than if the FDIC had intervened, and (2) the FDIC was grossly negligent in not distributing to them some of the cash paid by Kahn for PDI. The banks also argue that various misrepresentations made by the FDIC in and of themselves constitute substantial evidence of gross negligence by the FDIC sufficient to support the jury's verdict.
 
 
 17
 We turn first to the questions surrounding the alleged misrepresentations. While it is arguably evidence that the FDIC acted with the requisite state of mind, conscious indifference, there is no evidence that any misrepresentation damaged the banks and, they cannot alone support the jury's verdict. Upon brief reflection it is clear why. The participation agreements authorize the FDIC to act autonomously without consulting the banks. The banks admit that they have no right to a hand in the management of the "Y" Ranch Note. They are only entitled to receive their share of any payments on the note and to be reimbursed by the FDIC for losses they sustain as a result of the FDIC's fraud or gross negligence in administering the note.
 
 
 18
 The FDIC argues that the participation agreements preclude FDIC liability for letting the debtors market the "Y" Ranch themselves even if it was grossly negligent.[2] The FDIC points out that the participation agreements give the banks the "exclusive right to make collections," the exclusive right "to collect the entire credit at any time," as well as the exclusive right to sell credit and security and to foreclose. The FDIC argues that because these provisions give it complete discretion in selling collateral, they preclude liability in connection with the sale of the collateral.
 
 
 19
 Relatedly, the FDIC argues that the gross negligence provision of the participation agreement is not applicable to its actions in selling the "Y" Ranch. It states: "There shall be no liability to [the banks] for [the FDIC's] failure to make collections, or in general for any losses or expenses incurred by reason of [the banks] sharing in the profits of said credit unless such losses and expenses be due to fraud or gross negligence on [the FDIC's] part." The FDIC argues that the first part of the sentence, which precludes liability for failure to make collections, stands alone and is not subject to a fraud or gross negligence exception. According to the FDIC, that the fraud or gross negligence exception applies only to losses and expenses in general and not to damages caused by a failure to collect is evidenced by the use of the phrase "losses and expenses" twice in the second part of the sentence. Under this reading there is no liability at all for failure to make collections and only liability for other losses or expenses due to fraud or gross negligence.
 
 
 20
 We find these arguments to be less than compelling, but we do not need to finally resolve them because there is not substantial evidence that the FDIC was grossly negligent in allowing the debtors to market the "Y" Ranch. At the least the agreement limited liability in making collection to acts of gross negligence.
 
 
 21
 The banks argue that a trier of fact could conclude from the evidence that the FDIC negligently left the marketing of the "Y" Ranch in the hands of the debtors for over three years in a declining market and that the FDIC let the debtors market the property despite information suggesting that the debtors' marketing efforts were flawed. They note that the FDIC told them it would market the property at the end of 1985, but did not do so, waiting over 15 months to step in, and that FDIC sold the property within eight weeks after it took over the marketing of the ranch. They also contend that the evidence shows that the FDIC allowed an account officer to handle the debtors' credit line after it knew he could not handle complicated lines of credit. They assert that the failure of the FDIC to step in and market the property was so egregious that the jury could infer conscious indifference to the banks' interests from the FDIC's failure to step in.
 
 
 22
 Perhaps a trier of fact could reasonably conclude that the FDIC was negligent in not stepping in and marketing the property itself at some point during the three and one-half years the debtors attempted to sell the property. There is evidence that the FDIC knew the price of the ranch was dropping, indicating that the property needed to be sold quickly, and that the FDIC knew the debtors were not doing a good job marketing the ranch. Perhaps a jury might properly conclude that the FDIC should have realized at some point during the three plus years the debtors were allowed to market the property that it needed to step in to market the "Y" Ranch. But this is not enough.
 
 
 23
 There is not substantial evidence of conscious indifference to the banks' rights. For the evidence to support a finding of conscious indifference by the FDIC in not stepping in to market the "Y" Ranch, there must be substantial evidence that the FDIC knew that not stepping in to market the property was contrary to the interests of the banks, yet let the debtors market the property anyway.
 
 
 24
 As an initial matter, we note that the FDIC had no incentive to allow the debtors to market the property if it knew that they were doing an inadequate job, for the banks' interests and the FDIC's interests were the same--both the banks and the FDIC wanted the ranch sold quickly and at the highest possible price. Beyond the implausibility of conscious disregard, we find no evidence that the FDIC knew that letting the debtors sell the property would injure or was likely to injure the banks. In fact, the evidence shows that the FDIC was sensitive to the reality that stepping in presented a real risk that the price would drop dramatically.
 
 
 25
 The banks point to evidence that the FDIC knew the debtors' asking price was high at one point in 1984. But the debtors lowered their asking price without effect. At the same time, the debtors had every incentive to sell the property to staunch the cash drain on PDI. Moreover, the debtors did attempt to sell the property. The debtors hired a broker and had a sales contract on the property, although the purchaser was unable to secure financing.
 
 
 26
 That the debtors were unable to sell the ranch despite being given substantial time to do so does not add much. A major reason for the debtors' failure was the market for New Mexico ranches during this period. That the debtors were having difficulty in selling the ranch, therefore, does not support an inference that the FDIC was aware that debtors' marketing efforts were inept and that the FDIC acted in conscious disregard of the banks' interests in leaving the marketing of the "Y" Ranch to the debtors.
 
 
 27
 The banks also point to the inadequate account officer, but if the FDIC did not consciously disregard the rights of the banks in allowing the debtors to continue their marketing efforts, the asserted ineptness of the FDIC account officer adds nothing. Further, there is no suggestion that the FDIC's choice of account officer, even if made negligently, was made with conscious indifference. This theory would require evidence that the account officer was so incompetent that the FDIC must have known that the account officer would mishandle the banks' account, but allowed him to handle the banks' account anyway. The evidence was not there.
 
 
 28
 The banks' second argument is that they were damaged by the FDIC's gross negligence in not sharing the cash paid by Kahn for the PDI stock. We, however, do not see this claim as one for negligence in the performance of the contract. Rather, we see this as a simple breach of contract. The question is whether there was a contractual duty. See Coulson v. Lake L.B.J. Mun. Util. Dist., 734 S.W.2d 649, 651 (Tex.1987); Montgomery Ward & Co. v. Scharrenbeck, 146 Tex. 153, 204 S.W.2d 508, 510 (1947); see also Southwestern Bell Telephone Co. v. Delanney, 762 S.W.2d 772 (Tex.Civ.App.--Texarkana 1988, writ granted Sept. 20, 1989); Hideca Petroleum Corp. v. Tampimex Oil Int'l, 740 S.W.2d 838, 847 (Tex.Civ.App.--Houston [1st Dist.] 1987, no writ). The participation agreements require the lead institution to disburse to the banks payments they are entitled to as owners of the "Y" Ranch Note in proportion to their participation interest.
 
 
 29
 The banks argue that they were entitled to a share under the 1984 "Y" Ranch Note renewal and extension agreement. By the agreement, the debtors, for the renewal and extension of the "Y" Ranch Note, were to provide a security interest in three items of additional collateral. The first two items gave the banks nothing, for they were encumbered by first liens exceeding their value. George's unencumbered 46% interest in PDI was, however, the third item. As we see it, when the FDIC sold George's stock to Kahn, the banks had a right to a portion of the funds Kahn paid for George's stock under the 1984 renewal and extension agreement.[3] The FDIC points out that the assets underlying George's stock were encumbered by prior liens exceeding the fair market value of the assets, but this fact is irrelevant. The FDIC did not sell Kahn the PDI assets; the FDIC sold Kahn PDI stock and the banks had a right to a portion of the money paid for that stock.
 
 
 30
 The FDIC contends that the banks are precluded from arguing that George's PDI stock was unencumbered because they stated in their brief on appeal that George's 46% interest in PDI primarily secured other notes which exceeded the value of the stock. The FDIC argues that the banks are bound by this statement of fact despite its patent inaccuracy.[4] The banks corrected their misstatement of the record at oral argument and the parties were allowed to file supplemental briefs on this issue. We can appropriately treat statements in briefs as binding judicial admissions of fact. See Young & Vann Supply Co. v. Gulf, F. & A.R. Co., 5 F.2d 421, 423 (5th Cir.1925). Whether we do so, however, is within our discretion. American Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226-27 (9th Cir.1988); Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc., 607 F.2d 885, 906-07 (10th Cir.1979) (citing Young & Vann Supply Co.), cert. denied, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980).
 
 
 31
 We are not persuaded that we should treat the statement in the banks' brief as a binding judicial admission. First, we note that this situation is unlike admissions of fact in a summary judgment brief used to determine whether or not there is a genuine issue of material fact. See 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 2723, at 63-66 (1983); but see Hub Floral Corp. v. Royal Brass Corp., 454 F.2d 1226, 1228-29 (2d Cir.1972). Our concern is whether substantial evidence supports the jury's verdict. We see no reason to disregard portions of the evidence properly before the jury solely because the full import of that evidence did not become apparent until oral argument. We allowed the FDIC to file a letter brief in this court and it was not prejudiced by our consideration of the evidence relied on by the banks.
 
 
 32
 The FDIC also argues that the banks should be precluded from arguing that the failure of the FDIC to distribute to them a portion of the Kahn funds attributable to the 46% interest was a breach of contract because this is a new theory asserted for the first time on appeal. We disagree. The banks argued all along that they were entitled to a portion of the proceeds from the sale of the PDI stock under the 1984 extension and renewal agreement.
 
 
 33
 The banks also assert that the FDIC was obligated to distribute to them a portion of the Kahn funds because the FDIC released the two guarantors and the two makers of the "Y" Ranch Note, limiting the banks' recovery to the proceeds of the sale of the ranch.
 
 
 34
 The banks concede that the evidence showed that the debtors were insolvent at the time of the settlement. The FDIC argues that this concession is fatal to the banks' contention that the right to pursue the debtors was a valuable right. The FDIC argues that no obligation to disburse a portion of the Kahn funds to the banks arose because the right to obtain a deficiency judgment from the debtors, given the debtors' insolvency,[5] was not a valuable right. The evidence shows that the remaining obligations of PDI, FDGI, Stewart, and George had little if any value. They had few unencumbered assets and could have largely avoided liability through bankruptcy. Although at one point George owned an unencumbered 46% interest in PDI, even considering this asset George was insolvent. We conclude that there is insufficient evidence that the banks lost a valuable right when the FDIC released the debtors.
 
 
 35
 But the banks persist that the FDIC's renewal of two of George's notes payable to the FDIC totaling $1.8 million and George's later payment to the FDIC of $1,000,000 to retire the notes shows that the banks lost something valuable when the FDIC released George. We disagree. The evidence shows that the two notes were secured by oil well service equipment and real estate worth substantially less than George owed on the notes. The agreement shows that the FDIC believed that by renewing the notes, and not liquidating the security interest, and allowing George to operate the oil well service business and make reduced payments on the notes, there was a chance that George would be able to refinance the indebtedness in five years. Therefore, the FDIC took a risk and did not liquidate the security, but instead renewed the notes. The FDIC gambled on George's ability to operate the business, however, and George was able to make enough money to pay a portion of the amount he owed on these notes. But this does not change the fact that George was insolvent at the time the FDIC released him on his guarantee or the banks' failure to supply evidence that had the FDIC not released him, there would have been money available to satisfy the banks' unsecured deficiency judgment.
 
 
 36
 The debts of PDI and Stewart surely had some value. Their release was essential to the deal with Kahn. The sale would not otherwise have been completed. Similarly, there is evidence that the release of George from his guarantee of the "Y" Ranch Note had some value. George gave the FDIC his interest in PDI, which was essential to the deal with Kahn, in exchange for the renewal of two notes and his release from all other obligations. We do not agree, however, that the fact that the releases of PDI, Stewart, and George appear to have had some unquantifiable value obligated the FDIC to secure for them a portion of the funds paid into the settlement by Kahn. That the releases had value in the settlement with the debtors does not change the fact that the banks' only real right, to pursue the debtors for any deficiency, was essentially worthless.
 
 
 37
 In sum, we conclude that the banks had a contractual right to a portion of the Kahn funds under the "Y" Ranch Note renewal and extension agreement and reverse the district court's judgment n.o.v. and reinstate the jury's verdict. The damages awarded by the jury, however, are not supported by the evidence. The jury awarded the banks $239,786 each. It appears that the banks were entitled to $89,695.38 each, their pro rata share of the proceeds. Kahn purchased 94% of the PDI stock for $3,244,877 and the banks were entitled to a lien on 46% of the PDI stock. The portion of the Kahn funds which the 46% interest represented is $1,587,918.50 (46/94 X $3,244,877). Under the "Y" Ranch renewal and extension agreement the banks received a portion of the payments made by the debtors equal to the percentage their share represented in the debtors' credit line, approximately 5.65%.[6] The banks, therefore, were entitled to this portion of the money paid for George's stock--$89,695.38.[7] However, we are unwilling to finally rest on these calculations. Rather, we are persuaded that the case must be remanded to allow the district court to make an award.[8] The district court is free to decide the issue afresh. We include our calculating efforts for any assistance they may provide.
 
 III
 
 38
 We turn now to the banks' gross negligence claim against the United States under the FTCA. The banks' only recovery is for the FDIC's breach of its contractual duty to pay the banks their share of funds attributable to the "Y" Ranch Note. That is, the banks' recovery is only in contract and falls outside the FTCA's waiver of sovereign immunity. See Blanchard v. St. Paul Fire and Marine Ins. Co., 341 F.2d 351, 357-58 (5th Cir.), cert. denied, 382 U.S. 829, 86 S.Ct. 66, 15 L.Ed.2d 73 (1965); Walsh v. United States, 672 F.2d 746, 747 (9th Cir.1982).[9]
 
 IV
 
 39
 In sum, we hold that substantial evidence supports the jury's finding that the FDIC breached its contract with the banks and reverse the district court's contrary finding. We find that the damages awarded by the jury on the contract claim, however, are not supported by the evidence and remand the damages portion of the claim for consideration by the trial court. It may be that the damage calculation is no more than a matter of math and will not require a trial, but we leave these issues for the district court. We affirm the district court's dismissal of the FTCA claim against the United States.
 
 
 40
 AFFIRMED in part, REVERSED in part, and REMANDED in part.
 
 
 
 [1]
 After FNB-Midland was declared insolvent by the Comptroller of the Currency, the Comptroller closed the bank and appointed the FDIC as receiver for the failed bank. The FDIC in its corporate capacity then purchased from the FDIC-Receiver the loan at issue in this case and other related indebtedness as authorized by 12 U.S.C. Sec. 1823(c)(2)(A). See generally, Burgee, Purchase and Assumption Transactions under the Federal Deposit Insurance Act, 14 Forum 1146 (1979)
 
 
 [2]
 The certificates of participation executed by City National Bank and Texas Bank provide as follows:
 The foregoing evidence of the debt together with all security and/or other supporting documents pertaining thereto are held in trust for the reliable benefit of ourselves and all owners holding written evidence of their ownership of participation therein without preference or priority and without recourse on us.
 It is understood that we are to retain record title to the above collateral and are to have exclusive right to make collections, to collect the entire credit at any time, to service credit, to renew and extend, to sell credit and security, to foreclose, to charge you with your pro rata part of attorney's fees and expense of collection or defend any suit or claim which would in our opinion jeopardize our title or security. All action taken by us in good faith shall be binding on you.
 Further we agree to account promptly for all payments of principal and insurance received by us for application on the foregoing indebtedness and to disburse the same among the owners of the participation in the proportion that the participation of each bears to the whole. There shall be no liability to you for our failure to make collections, or in general for any losses or expenses incurred by reason of your sharing in the profits of said credit unless such losses or expenses be due to fraud or gross negligence on our part (emphasis added).
 
 
 [3]
 The banks complain that the FDIC never perfected a security interest in the three items of collateral promised in the "Y" Ranch Note renewal and extension agreement. Perfecting the security interests in the first two items of collateral, however, would have been a futile act since the liens were worthless second liens. Further, although George's interest in PDI was unencumbered, the FDIC's failure to perfect an interest in George's stock is of no independent consequence. The FDIC maintained complete control over the debtors' assets and was able to distribute the portion of the Kahn funds attributable to the lien interest of the banks if it had chosen to do so
 
 
 [4]
 An FDIC document discussing the terms of the possible settlement with the debtors unequivocably states that George's 46% interest in PDI is unencumbered. The FDIC does not deny that the 46% interest in PDI mentioned in the "Y" Ranch Note renewal and extension agreement was unencumbered
 
 
 [5]
 The banks make much of the fact that the district court incorrectly stated that the guarantors, Stewart and George, were in "receivership." For the purposes of this case, we see no practical difference between insolvency and receivership
 
 
 [6]
 The evidence shows that the banks received 5.64861% of payments by the debtors under the "Y" Ranch Note agreement
 
 
 [7]
 The calculation might be as follows: 0.0564861 X $1,587,918.50 = $89,695.38
 
 
 [8]
 In its cross-appeal the FDIC contends that the jury's finding that the FDIC did not fail to act in good faith absolves it of liability for gross negligence in performing its duties under the contract. Because the banks' recovery is not for negligence in performing the contract, however, but instead for breaching its contractual duty to pay the banks their share of money paid to the FDIC in connection with the "Y" Ranch Note, we need not address this argument. Good faith, even if it existed here, is not a defense to the FDIC's breach of a purely contractual obligation
 
 
 [9]
 We note that the United States has taken the position throughout this litigation that the banks' cause of action sounded solely in tort in the hope that all of the banks' claims would be dismissed because they fell within the discretionary function exception to FTCA liability. See 28 U.S.C. Sec. 2680(a). But we are not bound by the United States' characterization of the banks' cause of action. The federal government's waiver of sovereign immunity is jurisdictional. Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 701, 102 S.Ct. 2099, 2103, 72 L.Ed.2d 492 (1982); Beers v. North American Van Lines, Inc., 836 F.2d 910, 912 (5th Cir.1988)